May it please the court, my name is John Mirandas. I'm here on behalf of Petitioner Maria Santos Picasa Hernandez. I'd like to reserve two minutes for rebuttal. My client's a 59-year-old native and citizen of Mexico. She's married. She has six children. Me and the family lives together in Medford, Oregon. My client does not have any family in Mexico, except for some distant cousins. She's from a small town. It's a ranch town where there are no police, no public authorities other than a boss or a mayor-like person of authority. She inherited land that belonged to her grandfather back in 1993. This land's very valuable because it's located below sea level. It's ideal for irrigation. And it became the initial subject of dispute with the adjoining landowners. Two gentlemen by the name of Pascual and Antioco Sanchez are owners of the adjoining land, and they started to steal cattle and steal sheep that were being raised on the farm. They were aiming at trying to steal the land or take the land. And they were actually even killing some of the livestock. And so these problems with the neighbors continue. And my client and her husband, very humble people, did not retaliate in any way. But at some point, things escalated. The neighbors are associates with a gentleman by the name of Gregorio Infante, and he, in 1999, raped my client's daughter, and in either the same year or soon thereafter, murdered my client's husband, his brother, and other in-laws. So you're here on review of a denial of request for withholding or removal under the INA and under the convention against torture? That's correct, Your Honor. And specifically, the BIA had limited the issue to internal relocation. So that's the parameters you're here to discuss. And these facts that are going on. And we start with the BIA, whereas the IJ found that she did not suffer past persecution. The BIA assumed past persecution. That's correct. So that gives her a presumption that the INA is going to relocate. It does. And the BIA's burden is on the government to establish relocation. That's correct. Did they do that here? We already know they did not. Did the BIA even place the burden on the government? The BIA didn't even mention anything about burden of proof. They just simply stated that she didn't really relocate. Is the burden of proof, is it required to be mentioned, or is the question whether the IJ had substantial evidence of her ability to relocate? Well, with regard to questions of facts, substantial evidence is the primary standard. But with regard to questions of law, I would refuse to know. But when it's our position that the BIA just did not apply the primary standard whatsoever, Yes, sir. I understand that if there's substantial evidence that she didn't relocate, is that an improper standard? With regard to facts, that's the proper standard. Is this a factual issue about her ability to relocate? It is. But I think before we get to that issue, the BIA did not apply its own case law, and so they did not follow the regulations. Does the BIA have to get or follow these regulations when the question is, is there substantial evidence of her ability to relocate? Don't you just have to listen to the testimony? They do, Your Honor. But I want to point out that there are errors in the BIA decision. For example, they even cite the wrong regulation. They cite ACFR 1208.13, but really the proper regulation is 1208.16. They're analogous. They're very similar regulations. But there's really a two-part test. The BIA enunciated this two-part test when it further clarified this regulation. In the case of Eden Rae M's PMR, which decided the BIA decision, that two-step approach first requires the immigration judge to, or in this case Rae, to determine whether the applicant can avoid future prosecution by relocating to this ability to internally relocate. It actually requires that. The BIA said that they're assuming that there was possible prosecution, and as Judge Donovan said, that raised the assumption that there will be factual prosecution, if she ever chose to perform. Well, I think there's two issues there. Yes, the assumption arises past prosecution presumes future persecution. But if you look at the regulation itself, it also says where that presumption is in place, it shall be presumed that internal relocation would not be reasonable unless the service establishes. But evidence is sufficient to be about the presumption that internal relocation would not be feasible. The first is the government must prove that there is a specific area of the country where the risk of prosecution would fall below the well-founded fear level. They have to establish it's both safe and reasonable under the regulation, correct? That's correct. That's what our case law says, safe and reasonable. Yes, Commissioner. The evidence in this case is that her husband lived in Mexico City and lived there for a year and was not persecuted by the sanctions, true? Yes, Mexico City. So Mexico City was safe for her husband. Is there any reason to think it wouldn't be safe for her? Well, it was safe for her husband, but he then fled to the United States when there were threats of where people were trying to locate him. He chose to continue their trying to locate him, and he was in Mexico City at that time. Correct. But the BIA doesn't mention any specific area. He didn't feel safe in Mexico City. He didn't feel safe while he fled to the U.S.? That's correct. He didn't feel safe in Mexico generally. And so we have this two-part test, the specific location where the affluent must be safe, and then also there's some parts that requires the government to show that the area could be made accessible to the applicant, it would be practically safe and legally accessible to the person, and then comes part two, which is the reasonableness of the relocation. And that's the part where it appears the BIA just jumped straight into reasonableness and then only considered two factors. One is her husband went to Mexico City and he was safe for a year, and two, that there was a cousin that was living on the farm, and he was actually farming the farm, but he was living elsewhere. The record doesn't demonstrate where he was living. We don't know how far he was living. We don't know his circumstances, his family, and any of the other circumstances. And so the regulation and also the case MZMR talk about the factors that the court, the university judge as well as the BIA is supposed to consider, and I won't go through all of those factors, but in this case those factors were considered. And so we believe the record does include evidence of these factors. The only factor you discussed in your opening brief was her age, 59 years of age. Well, that's all the factors were discussed in your required brief. That's correct. That's correct. That's the last portion of the required brief. You're right. And she's an older woman, 59, no immediate family in Mexico, one year of primary school education. Her only connection to Mexico is this ranch, which is the sole source of income and support, but it's located adjacent to the Sanchez Brothers' land. The Sanchez Brothers have a connection to the Zetas, which is a transnational cartel, and we have country condition evidence in the State Department report talking about how these transnational cartels operate nationwide. There's widespread impunity and corruption. Serious problems remain. Violence is attributed to transnational and local criminal organizations. Violence against women persists. Does the cousin have any problems with farming the ranch? In the record, we are not aware of any problems with that cousin, but a previous cousin had been murdered on the front of that very same property, and so we just don't know the details of, is the cousin coming once a month? Is the cousin coming? You know, we don't know really any other details. In what address do you claim that you killed her? Only to say, Your Honor, we believe that my client's been a person who has been subjected to torture. She was physically hit with the butt of a rifle. She was pressed up against a barbed wire fence, and so she did suffer significant pain. This is in addition to the other threats of harm and threats to kill her and her children, and so we believe she has suffered past torture, and we believe that a public official, the mayor, turned a blind eye towards her reports of this harm and made her a family, and so we believe that she also qualifies under that scheme, or excuse me, under that additional form of relief, and we would apply the same analysis of the internal relocation. Last question. What relief do you wish us to order? Ideally, we'd seek reversal, but if a remand is necessary, a remand would also be appropriate to gather additional facts if necessary. You mean for what purpose? To apply the proper two-step approach to the internal relocation issue. Thank you. Thank you, Your Honor. Thank you. I'll give you a minute for rebuttal. Mayor, please record my agreement on behalf of the government again. This case, there was some discussion about the burden of proof. This case doesn't turn on the burden of proof. There wasn't a failure of meeting a burden. The immigration judge found by a preponderance of the evidence, which is the standard of proof, that she could avoid harm by relocating within Mike's Cove and that it was useful for her to do so. So the burden of proof question, well, is annoying. I just want to have some basic understanding here for just a moment. So the IJ found her credible, correct? Yes. And there's no dispute about her credibility. So we accept what she says is basically what happened, correct? And the BIA, you know, that came after a pretty lengthy decision that she decided on. She raised a number of issues, but the BIA assumed that she suffered past persecution. Correct. And under the regs, that gives her a presumption that she would suffer past persecution if she were to go back. And it also shifts the burden on relocation to the government, and it presumes that the government can't relocate, but the government's going to have to show that she can. Correct. Correct. Okay, so as I read the BIA decision, when it talked about the shifting burdens and the government's burden to establish that she could relocate, they answered, and I'm not sure if I got this correct, which is why there was a little mishap here, but they said something to the effect that the record does not establish that petitioners or Hernandez could relocate within Mexico to avoid future persecution. What does that mean? Can you repeat what? Yeah, exactly. It does not establish that Hernandez could not relocate. Did I get that wrong? I'm reading my notes, but I'm trying to find that statement in the. It says that even assuming that the app can demonstrate past persecution, we agree with the immigration test, the record does not demonstrate that it would be reasonable, that it would not be reasonable for her to relocate within Mexico. So what, I think. That's kind of a, we've said some words, language like that, and we've acknowledged them for our cases, doesn't demonstrate that the government's made its part. Well, I think that the board is using, it's stating the standard kind of in the negative, but it's an appellate body. So it's saying that she hasn't shown an appeal, that the record demonstrates that the immigration judge erred in making the finding. The immigration judge clearly made the finding in the first instance by finding that she could avoid harm, and that it was reasonable for her to do so. So the immigration judge obviously applied the right standard and burden of proof. And to the extent that the board may state it differently, I think that it's a matter of the board being an appellate body that may be reversing or stating the standard in the negative because it's her burden on appeal to show that the immigration judge got it wrong. Well, or she didn't do. How do we read the BIA's decision, or the IJ's decision with the BIA's decision? The BIA did its own decision. We don't record it. We don't assume that she suffered first. How do we find her? The board adopted one aspect of the immigration judge's decision that was dispositive of both her claims, which is the internal relocation decision. The immigration judge found that it wasn't on account of protected ground and that it was criminal activity and that it, you know, for various reasons, there was a persecution. And the board just didn't reach all those questions and relied solely on the relocation issue. If we remand it, can the board examine the whole question? Like we saw, yes. It's something that hasn't been presented to this court, and it's just something that they assumed away in their first decision. And so they would be free to go back. Whether or not they would do so, I don't know. One other thing is, the petitioner complains that the board decided their own regulation, 1208.13, rather than 1208.16. But I would note that the administrative library of fees decides 1208.13. So they're very similar regulations. One deals with asylum, one deals with art of holding, and they're substantively, I would say, almost identical. I wouldn't say they're identical, just because I haven't looked at them to look forward, but they're very similar. And this case doesn't turn on a difference of the regulations. Susan, did the board consider all the other factors that are involved in 1208.16b3? I think the board obviously considered everything she raised in her brief, which doesn't even really, you know, she didn't really even exhaust so much the relocation issue in her brief, because she waived it in her opening brief to the extent, other than to the extent that she's 68 years old. Fifty-eight. I'm sorry. I accept that. But I think the board just kind of reviewed the immigration judge's decision, and the record, it cites to the transcripts the immigration judge's decision. It applied the right standard. It determined whether or not it was reasonable. The fact that she has a cousin that continues to farm for him that hasn't had any problem so far as the record shows. Has the cousin ever reported the Sedgwick brothers to the mayor? I don't believe there's anything in the record that suggests that either way. So, and the fact that her husband, I know that his decision to leave Mexico City and come to the United States isn't necessarily an indication that he was in harm's way in Mexico City. He did not testify. They stipulated that his testimony would be consistent with hers and her half-brothers. Does he give the presumption of credibility? It's not found to be, unfortunately, not credible. If it's so, then he claims that the reason he left Mexico City was because of scrimmage. Correct. He, yes. But the fact that her cousin continues to farm the land and wherever he lives obviously is a safe place because he hasn't encountered any harm from the Sedgwick brothers or anyone else. But it's a matter of whether or not the record compels the conclusion contrary to that reached by the agency and the producer has simply failed to make that showing here. I used to have a question about the cat part of this case. Yes. So, you know, the cat's a little bit, the cat relief is a little bit different in here. There's not a burden-shifting kind of regime as in asylum and withholding. The regulation says they're supposed to consider all of these factors, but they're not supposed to keep a number of factors. When we put that on Bacopini and Maldonado, sort of clarifying how those factors are supposed to work, it's not that, although the alien has the burden of establishing an entitlement to the cat, there is real little burden to establish that. Now, if the alien is going to establish that, she can't relocate. Evidence of ability to relocate can be considered. But Maldonado lays out the correct analysis for getting the folding under 1208.16, the related provision of the same standard, the regular shotgun and the withholding. Maldonado came out in 2015, but the board's decision here was in 2013. And the board didn't have the advantage of a board decision, neither did the parties for that matter at the time. And we have other, we've had cases since Maldonado sending matters back to the CIA for reconsideration. We went to Maldonado, why doesn't this fit with the next year? The only thing the board focused on was the ability for Maldonado to do internal relocation. Didn't consider any of the other factors. Well, I would say, first of all, that the position is quite a bad issue. What do you call your internal relocation? What's that? A little bit under candy cuts, but internal relocation. That's true. I just don't think that they're, I'm not prepared to respond to the Maldonado standard, but I would say that basically the finding that she would avoid harm meets the ultimate burden under CAP, that she's not likely to be tortured, and that if she's going to avoid harm by relocating, she doesn't meet that ultimate burden. So, okay. Thank you. We have a minute for rebuttal. Thank you. I just want to point out, I don't believe we waived the other issues that were raised before the BIA, and also raised our opening brief. And we can see that, of course, in our repositories, we did sign the same regulation signed by the BIA. I'll probably point out the difference. And I think it's important to note that when we're analyzing a BIA decision for errors, it is important to note when the BIA has cited the improper regulation. But it did cite the case that analyzed the other regulation having to do with asylum. And so I think it's true. These are substantially similar regulations, and that's why that case matter of MZMR is so important. And we just want to point out that the BIA simply did not follow the two-part test. And I want to clarify that in Mexico City, the husband did find out that people were looking for him. It was specifically the Sanchez brothers who were connected to the Zetas, and the Zetas have this national reach. And that's why the entire family left Mexico due to this past harm and their threats, their fear of ongoing threats. And nobody's left of Mexico. Thank you. Okay, thank you. I'd like to thank both counsels for a very good argument. Thank you, guys.  Happy travels.
judges: Paez, Bea, Lamberth